


FILED

Feb 09 2026, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Court of Appeals of Indiana

In the Matter of S.V., Minor Child Alleged to be a Child in
Need of Services;

J.J. (Mother) and B.M. (Stepfather),

*Appellants-Respondents*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian Ad Litem*

---

February 9, 2026

Court of Appeals Case No.
25A-JC-1178

Appeal from the Marion Superior Court

The Honorable A. Richard M. Blaiklock, Judge

The Honorable Tara Y. Melton, Judge

Trial Court Cause No.
49D11-2405-JC-4576

---

**Opinion by Chief Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Chief Judge.**

## Case Summary

[1]     In this consolidated appeal, J.J. ("Mother") and B.M. ("Stepfather")[1] appeal the trial court's determination that S.V. ("Child") is a child in need of services ("CHINS") under both Indiana Code Sections 31-34-1-1 and 31-34-1-2 due to medical child abuse.  On appeal, Mother and Stepfather argue that the evidence is insufficient to sustain the trial court's determinations.  The evidence, however, demonstrated that Mother exaggerated or fabricated symptoms, which resulted in Child being subjected to extensive unnecessary medical care.  We conclude that the trial court's findings are not clearly erroneous.  Accordingly, we affirm.

---

[1] It is unclear from the record whether Mother and Stepfather are married, but we will refer to B.M. as Stepfather for clarity.  Stepfather has been part of Child's life since she was born.

## Issue

[2] Mother and Stepfather each raise one issue, which we consolidate and restate as whether the trial court's determination that Child is a CHINS is clearly erroneous.

## Facts

[3] Child was born in July 2017 to Mother and J.V.[2] at thirty-six weeks gestation. Child has received a significant amount of medical treatment and numerous surgeries in her short lifetime.

[4] Child experienced early feeding difficulties. When Child was seven weeks old, a swallowing study was performed. A nasogastric tube ("NG tube")[3] was placed to provide nutrition to Child. When Child was seven months old, she underwent surgery to place a gastrostomy tube ("G tube")[4], which fed Child directly into her stomach. Child, when approaching the age of three, underwent a procedure to place a gastrojejunostomy tube ("GJ tube")[5] in lieu of the G tube.

---

[2] J.V. does not participate in this appeal.

[3] An NG tube is a tube inserted through the nose, down the throat, and into the stomach for delivering nutrition.

[4] A G tube is a tube that provides nutrition directly into the stomach.

[5] A GJ tube is a tube that provides nutrition directly into the small intestine.

[5] Based upon Mother's reports regarding Child's medical symptoms, Child was evaluated for multiple medical conditions over the next several years, including: autism; attention deficit hyperactivity disorder ("ADHD"); cerebral palsy; spina bifida occulta; Chiari malformation[6]; Crouzon syndrome[7]; sleep apnea and chronic breathing issues; dysphagia[8]; tracheomalacia[9]; laryngomalacia[10]; dysmotility of the esophagus[11]; mild bronchomalacia,[12] which was diagnosed through a bronchoscopy procedure; chronic constipation, although a colonic motility study was normal; heart murmur, chest pain, and fast heart rates; cystic fibrosis; asthma; "vacant seizures," Tr. Vol. III p. 168; neurogenic bladder[13]; and hypermobility of her joints. Child was born with a "genetic variant" that can be associated with Crouzon syndrome; however, Child did not exhibit the clinical features of Crouzon syndrome, and doctors ruled out Crouzon syndrome. Tr. Vol. II p. 85.

---

[6] Chiari malformation occurs when part of the skull is too small or misshapen and brain tissue is pressed into the spinal cord.

[7] Crouzon syndrome is a genetic condition that causes cranial abnormalities.

[8] Dysphagia involves difficulty chewing or swallowing.

[9] Tracheomalacia is a defect of the trachea that causes noisy breathing or trouble breathing.

[10] Laryngomalacia is a defect of the voice box that causes noisy breathing or trouble breathing.

[11] Dysmotility of the esophagus is a defect of the esophagus that causes swallowing difficulties.

[12] Bronchomalacia is a condition in which the cartilage of the bronchi is weak, causing noisy breathing or wheezing.

[13] Neurogenic bladder is a bladder condition caused by nerve issues.

[6]     Child underwent multiple surgeries, including surgery for occult tethered spinal cord[14] in 2021 based upon Mother's reports of Child's urinary symptoms, gait issues, and toe walking; two surgeries for the repair of a type 1 mild laryngeal cleft in 2022, although such clefts are typically managed medically rather than surgically; placement of a cecostomy tube[15] in 2023 because, according to Mother, the medications were ineffective to resolve Child's constipation; and two tonsil/adenoid removal surgeries for sleep apnea. During this time, Mother was a paid caregiver for Child. Mother also created a GoFundMe account because she was unable to work while caring for Child.

[7]     Child has amassed a medical record of over 18,000 pages with treatment at Riley Children's Hospital, Peyton Manning Children's Hospital ("PMCH") in Indianapolis, and Cincinnati Children's Hospital. Dr. Elizabeth Kramer, a pediatric pulmonologist at Cincinnati Children's Hospital, began treating Child after Mother reported severe and persistent issues of sleep apnea, chronic coughing, aspiration of food and drinks, and asthma. During Dr. Kramer's first examination of Child, she heard a faint wheeze when she listened to Child's lungs. In October 2023, however, Mother indicated to Dr. Kramer that Mother believed Child would need a lung transplant, which Dr. Kramer indicated was unnecessary. Dr. Kramer became concerned that Child's reported symptoms

---

[14] Tethered spinal cord occurs when the spinal cord attaches to the spinal canal.

[15] A cecostomy tube is a tube that allows the administration of enemas directly into the large intestine for the management of severe constipation.

were not consistent with Dr. Kramer's "workup and examination of" Child. Tr. Vol. III p. 73.

[8] Dr. Andrew Strine, a pediatric urologist at Cincinnati Children's Hospital, evaluated Child for bladder dysfunction. Dr. Strine noted that doctors rely heavily on reports from parents, especially for younger children. Mother typically answered questions for Child, and Mother reported that Child was having issues with incontinence, emptying her bladder, and urinary tract infections. Dr. Strine's testing, however, did not indicate that bladder function was "significantly abnormal." Tr. Vol. II p. 36. At one point, Dr. Strine learned that Child was admitted to a different hospital, and nursing staff reported that Child was able to urinate successfully without any incontinence. Mother, however, reported continuing symptoms despite medication and physical therapy. Mother was "very interested" in more invasive options, including one option that required an abdominal operation necessitating significant recovery time. *Id.* at 39, 53. Dr. Strine, however, recommended continuing less invasive options and became concerned that the symptoms being reported by Mother did not correlate with the evaluation of Child.

[9] On April 16, 2024, Child had her second surgery to remove her tonsils and adenoids at Cincinnati Children's Hospital, but Mother then took Child to PMCH on April 18 and reported that Child was unable to keep her food down. At that time, Child wore leg braces and was being transported in a wagon or a wheelchair for longer distances. Child also had a cecostomy tube for chronic constipation and a GJ feeding tube. Mother had been reporting that Child

would not eat enough without the feeding tube; that Child had significant constipation requiring the surgical installation of a cecostomy tube for bowel movements; and that Child could not walk long distances and was falling five to ten times per day without leg braces and three to four times per day with leg braces. Mother continued to report that Child had chronic breathing issues. Mother informed doctors that Child had previously received Total Parenteral Nutrition ("TPN"), which allows nutrition to be provided through the veins instead of the gastrointestinal tract. Mother asked about Child receiving TPN again due to Child's alleged vomiting, but the doctors recommended against the procedure due to its high risk.

[10] Dr. Cortney Demetris, a pediatric hospitalist and child abuse pediatrician at PMCH, examined Child. Dr. Demetris noted that, when diagnosing medical conditions in young children, doctors rely upon a child's history and symptoms as reported by the parents, a physical examination, and objective information from testing. With young children, parental reporting of symptoms is particularly important, even when interpreting certain objective test results. False or exaggerated information provided by parents can result in misdiagnoses or unnecessary diagnoses.

[11] Dr. Demetris described "medical child abuse" as abuse that occurs when a child undergoes "unnecessary and harmful or potentially harmful medical care at the instigation of a caregiver who [is] providing false information to the medical teams." Tr. Vol. II p. 63. The child could have legitimate underlying medical conditions, but the medical care is "perpetuate[d] after the healthcare condition

is no longer requiring treatment." *Id.* at 144. Medical child abuse is harmful to a child because of the risks associated with the unnecessary healthcare, placing the child in a "sick role," in which the child believes he or she is sick, and which causes the child to miss normal developmental opportunities. *Id.* at 92. Medical child abuse can cause also psychological issues in the child that persist into adulthood.

[12] Dr. Demetris was concerned that Child was being subjected to medical child abuse because "there was a pattern of the types of medical problems that are largely based on provided history [w]ith a relative paucity of objective finding[s] supporting those diagnoses[.]" Tr. Vol. IV p. 67. Further, Dr. Demetris was concerned due to "maternal requests for some high risk medical interventions that seemed unusual and then also a relatively well appearing child despite the multiple medical diagnoses and procedures that she had." *Id.* Dr. Demetris determined that Child was possibly a subject of medical child abuse after her evaluation of Child, review of Child's medical records, and discussions with Child's medical providers.

[13] On April 20, 2024, the Department of Child Services ("DCS") received a report that Child was subjected to medical child abuse by Mother. A family case manager interviewed Mother on two occasions to discuss the medical treatments provided to Child. Mother said that both PMCH and Cincinnati Children's Hospital providers advised that Child would need a lung transplant if her pulmonary issues continued.

[14] On May 9, 2024, DCS filed a petition alleging that Child was a CHINS under Indiana Code Section 31-34-1-1 (general neglect). DCS alleged that Child had received excessive and improper medical care based upon Mother's misrepresentation and overstatement of Child's symptoms, history, and diagnoses. The trial court authorized Child's removal from Mother's care.

[15] Child was admitted to PMCH on May 10 for a ten-day observational stay in which her parents were not allowed to visit. During this stay, most of the medical interventions were discontinued. Dr. Demetris observed that Child was healthy; Child was eating normally without the feeding tube; Child was able to defecate normally with only over-the-counter Miralax; Child was able to run, walk, and skip without braces or a wheelchair; Child only fell once during her hospital stay; and Child did not have any urinary or respiratory issues. Dr. Demetris questioned the necessity of several surgeries and procedures that had been performed on Child. Dr. Demetris observed a pattern of false information provided by Mother to obtain healthcare for Child, and she was "[v]ery" confident in a diagnosis of medical child abuse. Tr. Vol. II p. 106. Child was subjected to many more surgeries than other patients Dr. Demetris had diagnosed with medical child abuse.

[16] On June 5, 2024, DCS filed an amended petition alleging that Child was a CHINS under both Indiana Code Sections 31-34-1-1 (general neglect) and Indiana Code Section 31-34-1-2 (serious endangerment). Specifically, DCS alleged that Child had been the subject of multiple invasive and unnecessary medical procedures based upon Mother's reports of symptoms. DCS also

added Stepfather as a party and alleged that he had "not acted to secure [Child's] safety and well-being." Stepfather's App. Vol. II p. 99.

[17] Child's first foster parent cared for Child from June 10, 2024, to July 15, 2024. The foster parent observed no issues with Child eating, defecating, sleeping, breathing, coughing, balancing, falling, or walking on her toes. Child did not use her GJ tube for eating, her cecostomy tube for defecation, her wheelchair, her leg braces, or her rescue asthma inhaler. The foster parent also saw no indication that Child had autism. Overall, Child was "very healthy," and her foster parent did not "have any concerns for her health." Tr. Vol. III p. 126. During supervised visits, Child was very active and playful, did not use leg braces or a wheelchair, and did not struggle with walking, falling, eating, or using the restroom.

[18] The trial court held fact-finding hearings on September 6, 10, 17, and 24, 2024, January 23, 2025, and February 4, 2025. At the time of the fact-finding hearings, Child's GJ tube and cecostomy tube had been removed. Child was eating normally and defecating well; Child did not have any breathing problems and was no longer on medications for her breathing; and Child was being weaned off "medication for GI" issues. Tr. Vol. II p. 91.

[19] Mother testified that Child has autism; Crouzon syndrome; colonic dysmotility; gastric issues; swallowing issues; tethered spinal cord, which was corrected; vision issues; mobility issues; bronchomalacia; tracheomalacia; and laryngomalacia. Mother believed that Child's gastric issues had resolved and

that Child has "outgrown things or things have seemed to get better as she's gotten older." Tr. Vol. III p. 195. Mother denied fabricating Child's symptoms.

[20] Dr. Nelson Rosen, a pediatric colorectal and urogenital reconstructive surgeon, testified that he performed the cecostomy surgery based upon Mother's reports of Child's symptoms, which, according to Mother, had not resolved with other therapies. Dr. Rosen, with hindsight, had regrets about doing the surgery.

[21] On February 27, 2025, the trial court entered findings of fact and conclusions thereon finding Child to be a CHINS. The trial court found that Dr. Demetris was "eminently credible;" that Mother provided false information regarding Child's symptoms that resulted in "misdiagnoses or unnecessary diagnos[e]s;" and that Child "was the victim of medical child abuse." Stepfather's App. Vol. II pp. 192, 195, 196. The trial court found Mother was not credible and concluded:

> Mother did not present to the Court as someone who believes she has done anything wrong. She has a genuine belief that [Child] had symptoms and diagnoses that needed medical treatment (she sometimes suggested or requested specific treatments to [Child's] medical providers, supra). The evidence established that [Child] did not have the symptoms Mother reported, and had procedures/treatments that were unnecessary. This lack of understanding is concerning to the Court should [Child] be returned home at present. Based on the evidence, the Court concludes that [Child] would continue to be subjected to unnecessary treatments because of Mother's inaccurate reporting of [Child's] symptoms.

> All of the credible evidence submitted to the Court leads the Court to conclude that the Parents, primarily Mother, were either overblowing or making up [Child's] symptoms in communications with [Child's] healthcare providers, which often resulted in more medical visits/treatments, or unnecessary medical visits/treatments.
>
> The Court finds that without its involvement, [Child's] physical and mental wellbeing is seriously endangered. There is enough of a pattern and practice by the Parents of conduct that resulted in unnecessary/overblown treatment and/or medical child abuse which, combined with Mother's lack of insight into what happened with [Child], *supra,* requires Court intervention. Even without the Court's conclusion that the Parents engaged in what Dr. Demetris described as medical child abuse, the Court finds that the history of Parents (primarily Mother) taking actions to obtain too much or unnecessary medical treatment for [Child] put [Child] in physical and mental danger that would not cease absent coercive intervention from the Court. [Stepfather] has not taken steps to prevent this from happening.

*Id.* at 201-02 (citation omitted). The trial court concluded that Child was a CHINS under both Indiana Code Section 31-34-1-1 and Indiana Code Section 31-34-1-2.

[22] On April 14, 2025, the trial court entered its dispositional order and ordered Child to remain in foster care; ordered that Child's medical care not be altered absent the consent of her medical team or the trial court; and required Mother and Stepfather, in part, to complete a psychological evaluation tailored to the

diagnosis of Factitious Disorder Imposed on Another[16] and follow the recommendations of the evaluation. Mother and Stepfather now appeal.

## Discussion and Decision

[23] Mother and Stepfather challenge the sufficiency of the evidence to support the trial court's determination that Child is a CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 228 N.E.3d 457, 475 (Ind. Ct. App. 2024) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)); *see* Ind. Code § 31-34-12-3. On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *R.L. v. Ind. Dep't of Child. Servs.*, 144 N.E.3d 686, 689 (Ind. 2020).

[24] Here, the trial court entered, sua sponte, findings of fact and conclusions thereon in granting the CHINS petition. "'As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment.'" *N.E.*, 228 N.E.3d at 475 (quoting *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014)). We review the remaining issues under the general judgment standard, which provides that a judgment "'will be affirmed if it can be sustained on any legal theory supported by the evidence.'" *Id.* (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.

---

[16] Factitious Disorder Imposed on Another, formerly known as Munchausen Syndrome by Proxy, involves making false claims that someone within your care needs medical attention.

1997)). We will reverse a CHINS adjudication only if it is clearly erroneous. *R.L.*, 144 N.E.3d at 686.

[25] DCS must prove three elements for a juvenile court to adjudicate a child as a CHINS: (1) the child is under the age of eighteen; (2) one of eleven different statutory circumstances exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. *N.E.*, 228 N.E.3d at 475.

[26] Here, the trial court found Child was a CHINS under both Indiana Code Section 31-34-1-1 (general neglect) and Indiana Code Section 31-34-1-2 (serious endangerment). Indiana Code Section 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[27]   And at the time this CHINS action was filed, Indiana Code Section 31-34-1-2(a)[17] provided:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court

[28]   "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in

---

[17] Indiana Code Section 31-34-1-2(a) was amended effective July 1, 2025.

need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id.* (citations omitted). "A CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard." *S.D.*, 2 N.E.3d at 1290.

Mother argues that the trial court's findings that Child is seriously endangered, that Child's needs are unmet, and that the trial court's coercive intervention is necessary are clearly erroneous. Stepfather argues that the trial court's finding that coercive intervention is necessary is clearly erroneous.[18]

## A. Serious Endangerment

Mother first argues that Child was not seriously endangered by Mother's actions. Mother contends that Child is currently healthy; that Mother followed the guidance of medical professionals; and that Child's medical conditions resolved independent of DCS involvement. The trial court, however, concluded that Child was seriously endangered because "Parents, primarily Mother, were either overblowing or making up [Child's] symptoms in communications with [Child's] healthcare providers, which often resulted in more medical visits/treatments, or unnecessary medical visits/treatments."

---

[18] It is unclear whether Mother and Stepfather are challenging the adjudication under Indiana Code Section 31-34-1-1 or Indiana Code Section 31-34-1-2(a). Accordingly, we will address the adjudication under both statutes.

Stepfather's App. Vol. II p. 201. The trial court concluded that Mother's actions "to obtain too much or unnecessary medical treatment" for Child put Child in physical and mental danger. *Id.* at 202.

[31] Dr. Demetris testified that medical child abuse is harmful to a child because: (1) there are risks associated with the unnecessary healthcare; (2) the child is placed in a "sick role," in which the child believes he or she is sick; and (3) the child misses normal developmental opportunities. Tr. Vol. II p. 92. DCS presented evidence that Mother exaggerated or fabricated Child's symptoms, which resulted in extensive medical evaluations and treatments. Mother repeatedly claimed that Child was having severe symptoms of various conditions, which were not confirmed by objective testing or testing demonstrated minor versions of these conditions. As a result, Child was subjected to numerous unnecessary procedures and surgeries, which caused unnecessary pain and placed Child at substantial risk. During the observational stay, most medications and medical supports were discontinued, and Child was observed to be healthy.

[32] Although Mother claims that Child was already on her way to being healthy due to prior medical interventions, we note that in the months before DCS's intervention, Mother was still claiming Child had severe symptoms and was seeking serious medical interventions. At the fact-finding hearing, Mother still claimed that Child had serious medical issues despite Child's health in foster care. Although Mother claims that she was merely following medical advice, Mother ignores the impact that her exaggeration or fabrication of symptoms had on Child's medical care.

The trial court found that Mother was not credible, and Mother's arguments on appeal merely request that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Under these circumstances, we cannot say the trial court's finding of serious endangerment is clearly erroneous. Accordingly, the trial court's finding that Child's physical or mental condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of Child's parent to supply Child with necessary medical care is not clearly erroneous. *See* I.C. § 31-34-1-1. Further, the trial court's finding that Child's physical or mental health was seriously endangered due to injury by the act or omission of Child's parent is not clearly erroneous. *See* I.C. § 31-34-1-2.

## B. Unmet Needs

Next, Mother argues that DCS failed to demonstrate that Child's needs were unmet by Mother. Mother argues that Child's good health after removal demonstrates that Mother was meeting Child's needs. DCS, however, points out that Mother's argument misses the mark, and we agree. Mother subjected Child to unnecessary and potentially harmful medical care. Child's good health after removal of the medical interventions demonstrated that those medical interventions were unnecessary. Mother's argument is merely a request to reweigh the evidence, which we cannot do. The trial court's finding that Child needed appropriate medical care, which she was not receiving, is not clearly erroneous.

## C. Coercive Intervention

Finally, both Mother and Stepfather argue that DCS failed to present evidence that the coercive intervention of the court was necessary. This CHINS element "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *In re D.J.*, 68 N.E.3d 574, 580 (Ind. 2017) (quoting *S.D.*, 2 N.E.3d at 1287) (italics in original). "[C]ourts 'should consider the family's condition not just when the case was filed, but also when it is heard.'" *Id.* (quoting *S.D.*, 2 N.E.3d at 1290). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

Mother argues that the medical providers are now on "high alert for any potential falsification by Mother" and that many of Child's medical issues have resolved. Mother's Appellant's Br. p. 22. Stepfather also argues that Child is no longer in need of "extensive medical treatment" and that the coercive intervention of the court is unnecessary. Stepfather's Appellant's Br. p. 13. The trial court, however, found that Mother did not believe she had done anything wrong and that Child "would continue to be subjected to unnecessary treatments because of Mother's inaccurate reporting of [Child's] symptoms" without the court's coercive intervention. Stepfather's App. Vol. II pp. 201-02. Further, the trial court found that Stepfather failed to take "steps to prevent this from happening." *Id.* at 202.

Even in light of Child's extraordinary improvement during the observational stay, at the fact-finding hearing, Mother testified that Child still had numerous medical conditions, including conditions that medical testing ruled out. Mother denied exaggerating or fabricating any of Child's symptoms. Similarly, Stepfather testified that Mother was in charge of Child's medical care and that he did not believe Mother exaggerated or fabricated Child's symptoms, despite the medical evidence showing otherwise. Mother and Stepfather are merely requesting that we reweigh the evidence, which we cannot do. Given the evidence presented, the trial court's finding that Mother would continue to subject Child to unnecessary medical care without the court's coercive intervention is not clearly erroneous.[19]

## Conclusion

The trial court's finding that Child is a CHINS is not clearly erroneous. Accordingly, we affirm.

Affirmed.

---

[19] Mother also contends that the current level of coercion is "overbroad" and that Child should return home with services continuing. Mother's Appellant's Br. p. 23. To the extent Mother is challenging the trial court's dispositional order, we review a trial court's order for services and conditions in a CHINS case for an abuse of discretion. *In re B.W.*, 266 N.E.3d 744, 751 (Ind. Ct. App. 2025), *trans. denied*. An abuse of discretion occurs when the court's action is "against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual inferences drawn therefrom." *Id*.

DCS recommended out-of-home placement until Mother and Stepfather can provide an environment free of medical abuse, and the trial court ordered that Child remain in her current placement. Further, Mother and Stepfather were ordered to obtain psychological evaluations and follow any recommendations. Given the severity of the medical abuse here, we cannot say the trial court's order was an abuse of discretion.

Bailey, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT-MOTHER

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Don R. Hostetler
Indianapolis, Indiana


ATTORNEY FOR APPELLANT-STEPFATHER

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana